UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:

                              Case No. 10-14377

PENNSYLVANIA ACADEMY OF MUSIC
   Debtor                              Chapter 11

## DISCLOSURE STATEMENT

**I. Introduction**

On May 27, 2010, Debtor, Pennsylvania Academy of Music ("PAM") filed a Petition under Chapter 11 with the United States Bankruptcy Court for the Eastern District of Pennsylvania. Debtor after filing has continued as Debtor-in-Possession pursuant to United States Bankruptcy Code, Title 11 U.S.C. §1107, and operated a music academy pursuant to §1108 of the Bankruptcy Code until April 1, 2011 when it suspended operations.

Since the Debtor is a corporation that is not a moneyed, business, or commercial corporation, the Bankruptcy Court cannot convert the case to Chapter 7 unless the Debtor requests conversion. PAM's Board decided to file a Plan of Reorganization, rather than convert to Chapter 7, in order to orderly liquidate the remaining assets and pay to Creditors and other parties-in-interest the largest amount of dollars, and to prevent the United States Trustee from filing a Motion to Dismiss the Case, or choosing to have the assets liquidated by a third party Trustee upon agreeing to convert to chapter 7.

PAM's Board of Trustees is giving its Creditors under the Bankruptcy Code an opportunity to vote whether to accept a Liquidating Plan of Arrangement ("Plan"). Debtor filed its Plan of Arrangement on April 6, 2011, a copy of which is enclosed.

Debtor has prepared this Disclosure Statement to provide creditors with information that is material, important, and necessary for them to arrive at an informed decision in exercising their right to vote on whether or not to accept the Plan. The information contained in this statement is intended solely for that purpose and solely for the use of known creditors of the Debtor and, accordingly, may not be relied upon for any purpose other than a determination of how to vote on the Plan.

Any Creditor or interest holder in order to vote on the Plan must have filed a Proof of Claim prior to October 8, 2010, or listed as an undisputed creditor on the Schedules filed. A creditor may vote to accept or reject the Plan by filling out and mailing to JACQUES H. GEISENBERGER, JR., P. C., 941 Wheatland Avenue, Suite 403, Lancaster, Pennsylvania, 17603, the ballot which is enclosed with this Disclosure Statement.

The Court has fixed              , 2011, at              o'clock .m., as the last day by which ballots must be filed with JACQUES H. GEISENBERGER, JR., P. C.  No vote received by JACQUES H. GEISENBERGER, JR., P. C. after that time will be counted.  Whether a creditor or interest holder votes on the Plan or not, such person will be bound by the terms and treatment set forth in the Plan if the Plan is accepted by the requisite majority of Class 3 creditors and confirmed by the Court.

You are urged to fill in, date, sign, and promptly mail the enclosed ballot.  In order for the Plan of Arrangement to be deemed accepted by creditors, a simple majority in number and two-thirds (⅔) majority in amount of claims filed and allowed (for voting purposes) by impaired Classes 3 must vote to accept the Plan.  Please be sure to properly complete the form and legibly identify the name of the creditor or interest holder.

No representations concerning the Debtor or the Plan is authorized other than as set forth in this statement.  Any representations or inducements made by any persons for the purpose of securing a vote other than are contained in this statement should not be relied upon.  Certain of the information contained in this Disclosure Statement is taken directly from other, readily accessible documents, such as the Debtors Bankruptcy Schedules and Orders of the Bankruptcy Court.  While Debtor has made every effort to retain the meaning of the information taken from these other documents, the Debtor urges that any reliance on the contents of these other documents should depend on a thorough review of the documents themselves.  The Debtor is unable to warrant or represent that the information contained in this Disclosure Statement is without any inaccuracy, although great effort has been made to be precise and accurate.

## II.    Nature and History of the Debtor

Debtor was established in 1989 and continuously operated a music academy under applicable provisions as a 501(c)(3) Charitable Organization until April 1, 2011. Over those almost twenty-two (22) years it conducted individual instruction and held classes at several different locations in Lancaster, Lancaster County, Pennsylvania. PAM relied heavily upon the Lancaster Community for financial donations and support throughout its history. This is fairly standard practice with most community-based music schools we have surveyed. Starting in the year 1999 PAM's Board of Directors decided to seek funding to do a major expansion of a facility it was then occupying at 42 North Prince Street, Lancaster, Pennsylvania.

Substantial funds from private donors, plus more than $7,500,000 in governmental grants and concessions from the Commonwealth of Pennsylvania, Lancaster City, and County, were contributed over the next six years, prior to the time construction contracts were signed in April 2006 and ground was broken. During the two year period of actual construction on the building at 42 North Prince Street,  there were over 400 change orders approved as additions or deductions to the original contract price which escalated the original contract price by more than $8,000,000. When 42 North Prince Street was completed in April 2008, there was a "shortfall" of at least $10,000,000 in funds. This "shortfall" was either guaranteed personally by two (2) members of the Board of Trustees or charitable and private corporate entities with which those individuals were affiliated. The building opened on June 11. 2008.

Financial problems associated with operating in the new building surfaced immediately. One year later, PAM was in default on numerous obligations including payments due to Union National Community Bank ("UCNB"), Fulton Bank, and J.P.Morgan Chase. UNCB eventually entered judgment and issued execution against the real estate at 42 North Prince Street. These defaults led to the resignations in June 2009, of the Board's Chair and Vice-Chair.

New Board leadership was elected, but was unable to stem the growing financial crisis. In what was a short term attempt to save the new building, the Board in late December 2009, entered into a quick agreement with its Lenders and the Guarantors whereby PAM conveyed 42 North Prince Street to UNCB in exchange for cancellation of PAM's indebtedness, with a terminable lease on sixty (60) days advance notice by either party for 6 months at $10,000 per month until June 30, 2010, increasing to $20,000 per month thereafter. At the same time PAM conveyed 2 improved unencumbered real estate located 24 North Prince Street and another at the northwest corner of President Avenue and Marietta Pike plus unencumbered 'non-essential' property to an entity formed by Guarantors.

Within forty-five (45) days of this Settlement Agreement's signing, all members of the Board resigned in a dispute with the founders of PAM. On February 21, 2010, Dr. D. Holmes Morton and his wife, Caroline Morton, met with those Founders and Attorney Jacques H. Geisenberger, Jr., Esq., to explore the possibility of "saving the educational component" of the Academy. Within a week the founders themselves voluntarily resigned from the Board and severed any ties to the Academy.

New Trustees were elected to what became known as the Morton Board, to distinguish it from all previous Board iterations. An executive director was selected and attempts began to re-mediate the institution.

In early March 2010, within a week of the constitution of a new Board and management, the Commonwealth of Pennsylvania, Office of Attorney General, Charitable Trusts and Organizations Section advised PAM that it was being investigated. No reason was offered. As a result the new Board decided that no more funds should be withdrawn from the Endowment to meet operational expenses until this matter was clarified. The Morton Board cooperated with the Attorney General's investigation and directions, holding community fund raisers and seeking private donations to pay the costs of operating the school through the end of the 2009-2010 academic year.

At the end of that academic year, the PAM Board voted to file the present Chapter 11papers, exited 42 North Prince Street, moved its hard assets into storage, and took the summer of 2010 to evaluate whether it should continue the school and where. During that period PAM held a successful summer Festival at Linden Hall and taught other students at the Church of the Apostles. In June 2010 after hearing nothing further from the Attorney General's office, PAM requested Bankruptcy Court approval to use unrestricted Endowment Funds to fund its operations going forward. Permission was granted between July and December to use funds in ever increasing amounts, finally capped by an agreement to use up to $318,000 through June 30, 2011.

With 125 students enrolled for the Fall 2010 semester, the Morton Board made the decision to relocate and resume teaching at Liberty Place. It also began planning to exit bankruptcy by February 2011. It cut staff, raised tuition, drafted a business plan, and took legal action to collect accounts receivable. Unfortunately it was pilloried in the local press for attempting to recover a large unpaid amount of money from its former Treasurer who had quietly forgiven his own pledge without seeking Board approval.

During December 2010, it began an annual fund raising campaign among existing and former supporters, which fell far short of its goal. In February of 2011, an arbitration decision went against the Academy and the public pillory resumed.

Now, with over 200 student enrolled, having already withdrawn up to the previously authorized limit from the Endowment, it was clear, that without substantial donations together with grants from other charities or corporations, that it would run out of money either sometime at the middle or end of March.  It lacked funds payroll, rent and other operational costs. The Morton Board decided to make one final effort to raise funds by a Big Push campaign between February 15 and March 15, 2011. Again the community failed to support while a new wave of adverse publicity played out in the Press over the arbitration outcome. In one final attempt to keep the school open through the end of the 2010-2011 academic year it announced in the press that unless $175,000 was raised by March 29, 2011, PAM would close its doors on March 31, 2011.

One of the members of Board donated sufficient funds to meet the March payroll shortfall. By March 31, the needed support had not arrived. PAM suspended operations.

The PAM Board believes that supervision of the Bankruptcy Court in the liquidation of its unencumbered assets including pianos, keyboards, musical instruments, sheet music, and miscellaneous items in an orderly fashion will produce the most money for distribution to creditors. Debtor could voluntarily convert the Case from Chapter 11 to Chapter 7 and a Trustee could be appointed to dispose of the same assets through a public auction and at additional costs to compensate the Trustee on a percentage basis. The other alternative is to dismiss the bankruptcy and have an unsupervised distribution of assets which the Board feels would be chaotic.

### III.     Debtor's Present Financial Condition

Debtor has been filing and will continue to file with the Bankruptcy Court a Monthly Operating Report ("MOR"), through the date the Case is closed. The most recent MOR is attached and all prior ones are available by written request to Debtor's Counsel. Also attached is a Cash Basis Operating Statement and Balance Sheet.

1. <u>Administrative Claims</u>.  Since the filing of the Petition for Relief, the Debtor has incurred debts to the Chapter 11 Trustee, attorneys, accountants, and may in the future incur obligations to others.  Any fees due administrative claimants remain unpaid.

      2. Priority Claims.  The Bankruptcy Code gives certain pre-petition claims priority including employees wages and other benefits and taxes.  There will be a substantial amount of priority claims paid ahead of any claims to unsecured creditors, the amount of which is not known at this time but from the Schedules filed appear to be $8,000.00.

      3. Unsecured Claims.  Debtor believes that the Unsecured Claims total approximately $150,000.00.  The Plan proposes to pay Class 2 pro-rata up to the full amount of the principal amount of their claims plus interest.

## IV. Payments Since Filing Petition

      The filing of the Petition for Relief in Bankruptcy operates as a stay of all collection efforts against the Debtor.  Debtor has no knowledge of any pre-petition debts paid by it after the filing of its Petition.

## V. Plan of Reorganization

      1. General Considerations.  It is the Debtor's belief that if it is given the opportunity to collect its assets in an orderly fashion the Plan will pay Administrative Claims; pay all Priority Claims in full; and all Unsecured Creditors in full plus interest; and have a surplus remaining in addition to its Endowment Fund which presently has a balance in excess of $817,000.00 to distribute to another 501(c)(3) of either PAM's choice, or by cy pres, all of which is more than would be realized if the Debtor were liquidated in Chapter 7.  This belief is based upon the fact that PAM is closed, that there is no need to further deplete the Endowment Fund, and the individual Trustees have the necessary time, interest and expertise to produce the highest dollars for PAM's creditors, and after liquidation have the largest fund obtainable available for music education, PAM's charitable mission.

      2. Plan Funding.  The Plan will be funded from the liquidation of the Debtor's assets.

      3. Payments to Claimants.

            A. Upon confirmation of the Plan, all unpaid administrative and priority claims shall be paid in full.

            B. Class 2 - Unsecured Creditors will be paid pro-rata up to full amount of their claims plus interest.

      4. Support of Plan.  The Debtor has not solicited support for this Plan.

THIS DISCLOSURE STATEMENT IS BUT A BRIEF SUMMARY OF THE PLAN AND SHOULD NOT BE RELIED ON ALONE BY CREDITORS FOR VOTING PURPOSES. IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PROVISIONS IN THE PLAN SHALL PREVAIL. CREDITORS ARE URGED TO CONSULT WITH COUNSEL AND WITH EACH OTHER IN ORDER TO FULLY UNDERSTAND THE PLAN AND THE EXHIBITS ATTACHED TO IT. THE PLAN REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT, AND AN INTELLIGENT JUDGMENT CONCERNING THE PLAN CANNOT BE MADE WITHOUT UNDERSTANDING IT.

Date: April 6, 2011

PENNSYLVANIA ACADEMY OF MUSIC
By: /s/ Thomas F. Godfrey
    Thomas F. Godfrey - Chair
    313 WEST LIBERTY STREET
    SUITE 210
    PO BOX 1615
    LANCASTER PA 17603

JACQUES H. GEISENBERGER, JR., P. C.
By: /s/ Jacques H. Geisenberger, Jr.
    Jacques H. Geisenberger, Jr.
    941 WHEALAND AVE - STE 403
    LANCASTER PA 17603-3180
    TEL 717/397-3500 ▪ FAX 717/299-5813
    E-Mail  jacques@geiscoop.com

    Debtor and Debtor-in-Possession

    Attorney for Debtor and Debtor-in-Possession